No. 05-174

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 42

_____

IN THE MATTER OF JOSEPH ENGEL, III,          )
                                             )        O P I N I O N
An Attorney at Law.                          )          A N D
                                             )        O R D E R
                                             )
          Respondent.                        )

_____

¶1      We discussed at length the facts giving rise to this matter in *In re Conservatorship of Kloss*, 2005 MT 39, 326 Mont. 117, 109 P.3d 205, and *In re Engel*, 2007 MT 172, 338 Mont. 179, 169 P.3d 345 [hereinafter *Engel I*].  We will repeat here only those facts pertinent to our decision to impose on Engel a sixty-day suspension.  The Office of Disciplinary Counsel (ODC) filed a complaint against Joseph Engel, III, (Engel), an attorney licensed to practice law in the state of Montana.  We determined that Engel had violated Rules 1.5, 1.15, and 1.18, of the Montana Rules of Professional Conduct (MRPC).  *Engel I*, ¶ 48.

¶2      The Commission on Practice of the Supreme Court of the State of Montana (the Commission) held a hearing regarding the appropriate sanction for Engel.  The Commission recommends that we impose on Engel a public censure and the costs of the disciplinary proceedings based on the Commission's finding that several mitigating factors weigh against any harsher sanction.  We decline to follow the Commission's recommendation.  We conclude that in addition to a public censure and the obligation of the costs of the disciplinary proceedings, Engel's conduct warrants a sixty-day

suspension from practice.

## STANDARD OF REVIEW

¶3    This Court "possesses original and exclusive jurisdiction and responsibility" in all matters involving the disciplining of lawyers in the state of Montana. *See* Introduction, Montana Rules for Lawyer Disciplinary Enforcement (MRLDE). We review de novo the Commission's findings of fact, conclusions of law, and recommendations. *In re Potts*, 2007 MT 81, ¶ 32, 336 Mont. 517, ¶ 32, 158 P.3d 418, ¶ 32. We weigh the evidence upon which the Commission's findings rest. *Potts*, ¶ 32.

## DISCUSSION

¶4    The Commission cites the presence of several mitigating factors to support its recommendation. The Commission first asserts that the Court did not disavow expressly the Commission's finding that Engel "had received $295,000 in fees from Kloss during the period 1998-2005, whereas [Engel] recorded over $330,000 in time and expenses representing Kloss." The Commission cites the fact that Robert James (James), Engel's opposing counsel in the Edward D. Jones litigation, initiated the complaint against Engel and suggests that James's litigation tactics played a large part in driving up the litigation costs. The fact that Kloss never complained about Engel's work or his fee represents a further mitigating factor in the Commission's view. The Commission asserts that Engel worked "over an extended period of time and achieved positive and beneficial results for [Kloss]." Finally, the Commission cites the negative publicity surrounding Engel's role in this matter as a mitigating factor. We disagree with the Commission with respect to each alleged mitigating factor.

2

¶5 Engel's Billable Hours.

¶6 Engel argues that the Commission understood his fee arrangement with respect to the "overall picture" of his representation of Kloss, which includes: (1) the termination of a Charitable Remainder Trust (CRT); (2) a tort claim against Edward D. Jones, a brokerage firm; and (3) opposition to a petition for the appointment of a conservator for Kloss filed by James, the opposing counsel in the Edward D. Jones litigation. The record fails to support Engel's claim, however, that the "overall picture" of his representation of Kloss justifies his fee.

¶7 Kenneth Parrent (Parrent), Kloss's 71-year-old nephew, executed a fee agreement on Kloss's behalf on July 1, 1998, to have Engel terminate the CRT for an hourly rate of $125. *Engel I*, ¶ 9. Engel's billing records indicate that he performed 65.9 hours of work in terminating the CRT. *Engel I*, ¶ 9. Kloss paid Engel $8,362.50 for this work in 1998 according to the terms of the hourly fee agreement. *Engel I*, ¶ 9.

¶8 Engel signed a second fee agreement with Kloss on October 27, 1998, relating to the tort action against Edward D. Jones. *Engel I*, ¶ 10. The second fee agreement provided that Engel would bill Kloss at an hourly rate of $125 from an original $20,000 retainer provided by Kloss. *Engel I*, ¶ 11. This second agreement further provided that Engel would receive thirty-five percent of any recovery in the action against Edward D. Jones. *Engel I*, ¶ 11. The agreement makes no mention of any arrangement, however, whereby Kloss would fund the Edward D. Jones litigation from the proceeds of the CRT.

¶9 The parties presumably intended the original $20,000 retainer to fund the Edward D. Jones litigation. Kloss provided an additional $50,000 retainer in 2002. *Engel I*, ¶ 11.

3

Engel's accounting practices make it impossible to determine to which litigation this $50,000 retainer applied. Engel did not place either the $20,000 retainer or the $50,000 retainer in his trust account. Engel instead placed both retainers directly into his operating account. *Engel I*, ¶ 11. We determined that these actions, standing alone, violated Rules 1.15 and 1.18, MRPC. *Engel I*, ¶ 41.

¶10 Engel justified the size of the fee for his work in pursuing the uncontested dissolution of the CRT, in part, on the separate action in which James petitioned for a conservator for Kloss. Engel also asserted that he used the $50,000 retainer to cover the cost of his work in contesting James's petition for a conservator. *Engel I*, ¶ 11. Engel changed the fee agreement for terminating the CRT on February 1, 2000. James did not petition for the appointment of a conservator for Kloss until June 2003--about 18 months after Engel received the $50,000 retainer and several years after Engel modified the fee agreement for terminating the CRT. *Engel I*, ¶¶ 11-12.

¶11 The Commission gives Engel the benefit of the doubt in suggesting that he properly earned these retainers and the remaining fee of nearly $130,000 that he received for the Edward D. Jones litigation. We decline to provide Engel with this benefit in light of the numerous inconsistencies in the record. Engel's billing records, the various fee agreements, and Engel's shifting explanations for his accounting practices raise more questions than provide answers.

¶12 We concluded that Engel's fee in collecting $121,545 for his work in an uncontested proceeding to terminate the CRT "cannot be deemed reasonable under any circumstances." *Engel I*, ¶ 33. This conclusion invalidates more than one-third of the

4

total amount that Engel received and, at the very least, raises questions regarding the validity of Engel's remaining fee. The record does nothing to resolve those questions. The Commission's recommendation, on the other hand, validates the remaining two-thirds of Engel's fee and implicitly challenges our conclusion that Engel's after-the-work-was-performed modification of the fee agreement from an hourly fee to a contingency fee could not be justified "under any circumstances."

¶13    The ODC's amended complaint against Engel did not address specifically the entire scope of Engel's representation of Kloss. As a result, we did not resolve the legitimacy of the remaining two-thirds of Engel's fee. We see no mitigation in the fact that we did not repudiate explicitly the Commission's finding relating to an issue not germane to our review.

¶14    James's Filing of Complaint.

¶15    The Commission continues to advance as a mitigating factor the fact that James, Engel's opposing counsel, initiated this complaint and employed "tactics" that allegedly drove up Kloss's expenses, including James's filing of a petition for a conservator for Kloss. A disinterested District Court held a hearing on James's petition. We commend to the Commission the District Court's Findings of Fact, Conclusions of Law and Order, Ex. 76, and the transcript of the hearing on James's petition, Ex. 75, before they imply that James filed the petition to gain a tactical advantage in the litigation with Edward D. Jones.

¶16    The District Court addressed the issue of whether to appoint a conservator for Kloss when faced with the fact that Kloss's former nearly $1,000,000 estate had a value

5

of less than $5,000 at the time of the hearing.  Kloss generally could provide no explanation for the precipitous drop.

¶17    The District Court found that Kloss remained oblivious to her financial state and that her nephew, Parrent, had squandered a large part of her estate.  Specifically, Kloss did not know that she had deeded to a Colorado corporation a 4,000 square foot house located in Fairfield, Montana, that she recently had purchased.  The Colorado corporation, established by Parrent, had no employees, income, or expenses.  The District Court stated that the corporation "appears to be a shell . . . ."  Kloss was unaware that Parrent had been using her money to pursue legal and private investigative services in Colorado for his personal matters.  Kloss did not know that she had suffered a $167,000 loss in one year in her brokerage account.  Kloss did not know that she had borrowed funds by way of a margin account and that she had paid nearly $75,000 in interest on these funds.  Kloss testified that she had never used the margin account.

¶18    The District Court further found that Parrent had led Kloss to believe that the CRT eventually would divest Kloss of her entire estate.  The District Court determined that Parrent had failed to explain to Kloss that, rather than losing her entire estate, she would have retained $650,000 outside the CRT and earned seven percent annual interest on the $350,000 principal of the CRT until her death.

¶19    The District Court found that Parrent had no means of support outside of Kloss.  He lived in the house that Kloss had deeded to his shell corporation.  He drove a car that Kloss had bought for his shell corporation.  Parrent also served as the sole support for his

6

live-in fiancé. Despite having no other means of support, Parrent somehow satisfied $200,449 worth of his federal income tax liens in September of 2000.

¶20 The District Court also found that Parrent had taken over Kloss's investment decisions. According to the stock broker, Parrent "was trying to make money by buying and selling stocks." The District Court found that Parrent had begun investing in "aggressive, volatile, and risky securities."

¶21 Finally, the District Court found that shortly before it had entered its order freezing Kloss's assets and ordering Parrent not to exercise his power-of-attorney, Parrent emptied more than $156,000 from Kloss's brokerage account. Parrent could give no accounting as to what had happened to Kloss's money. Parrent did not take all of his aunt's money. He left Kloss about $950.

¶22 James learned all of this information during the discovery phase of the Edward D. Jones litigation. James, an attorney bound by the Rules of Professional Conduct, had little choice in the face of this avalanche of avarice. Engel nevertheless seeks to disparage James and his motives for petitioning for a conservator for Kloss. The Commission characterizes James's petition as a "tactic" that "[drove] up the litigation costs" and implies that James inappropriately initiated the complaint against Engel.

¶23 The District Court specifically found that James received no compensation for seeking the appointment of a conservatorship. The District Court further determined that James "undertook this matter to protect Mrs. Kloss, and not for any other or improper purpose." Indeed, the fact that Engel filed a petition to appoint Parrent as a conservator for Kloss in 1998 supports the notion that Kloss needed protection. Engel represented to

7

the court in that petition that Kloss needed a conservator due to her "age and failed health" and her "inability to function independently." Engel withdrew the petition based solely upon opposition from relatives to the appointment of Parrent as the conservator, and not based upon a changed perception regarding Kloss's ability to manage her affairs.

¶24 More importantly, Rule 8.3(a), M.R.P.C., specifically requires a lawyer to inform the ODC of another lawyer's "violation of the Rules of Professional Conduct." We determined that Engel had violated three separate rules. *Engel I*, ¶ 48. Designating James's reporting of these violations as a mitigating factor undermines a lawyer's duties pursuant to Rule 8.3(a), M.R.P.C. We refuse to encourage members of the bar to sit on their hands in the face of potential misconduct by opposing counsel.

¶25 <u>No Complaint By Kloss</u>.

¶26 The Commission cites Kloss's failure to complain about Engel's legal services or the fees that he charged for those services as mitigating the effects of Engel's ethical violations. Kloss's testimony at the hearing for the appointment of a conservator belies any apparent satisfaction with Engel's legal services and the fees that he charged.

¶27 Kloss testified that she had paid Engel several thousand dollars to terminate the CRT. We now know that Kloss paid Engel more than $121,000 to terminate the CRT pursuant to Engel's after-the-work-was-performed modification of the fee agreement. The District Court found that Parrent had written all the checks for legal fees to Engel and that Kloss did not "understand or appreciate how much was spent in attorney's fees, or whether that is a proper amount to spend in attorney's fees for the work that was performed."

8

¶28 Kloss testified in that same proceeding that she had paid Engel $2,500 in legal fees in the Edward D. Jones litigation. We now know that Engel accrued fees in that litigation in the neighborhood of $200,000. Kloss testified at the hearing in 2003 that she had paid Engel about $7,500 in total legal fees when in fact she had paid Engel more than $300,000. It comes as no surprise, therefore, that Kloss would have "no complaint" regarding Engel's fee. We disagree with the Commission's view that Kloss's apparent satisfaction with Engel's legal services and his fees constitutes a mitigating factor in light of this testimony.

¶29 <u>Positive and Beneficial Results for Kloss</u>.

¶30 The Commission determined that Engel's work produced "positive and beneficial results" for Kloss. Our decision in *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, 310 Mont. 123, 54 P.3d 1, emerged from Kloss's action. The *Edward D. Jones* litigation established the important principles that the brokerage contract at issue constituted a contract of adhesion and that, as a result, no party could enforce the contract's arbitration provision. *Edward D. Jones*, ¶¶ 27, 32. More importantly, for our purposes, the Court held that the broker owed Kloss a "fiduciary duty" that included explaining the consequences of the arbitration provision. *Edward D. Jones*, ¶ 38. Engel pursued litigation that established a fiduciary duty for brokers while he committed abuses of the fiduciary duties that he owed to his client in that same litigation.

¶31 The parties eventually settled the action with Edward D. Jones agreeing to pay $150,000 to Kloss. Engel "waived" any further fee in the *Edward D. Jones* case. We note that Engel "waived" any further fee only after James had filed a petition for the

9

appointment of a conservator, after the District Court had denied Engel's motion to dismiss the petition, after Engel allegedly had expended $77,338.22 in resisting the appointment of a conservator for Kloss, and shortly before the District Court held a hearing on James's petition.

¶32 Kloss already had paid Engel roughly $200,000 in the case. Though Engel's accounting practices make precision impossible, Kloss appears to have suffered a net loss of $50,000 by pursuing the claim against Edward D. Jones. We fail to discern on the record before us any "positive and beneficial results" for Kloss.

¶33 <u>Negative Publicity for Engel</u>.

¶34 Finally, the Commission cites as a mitigating factor Engel's testimony that "press publicity about the Kloss litigation and his role in it has been ruinous to his reputation and law practice." Engel elected to assist Parrent in undoing Kloss's CRT and filing a tort action against Edward D. Jones. Engel drafted all of the fee agreements at issue. He had ready access to the same information presented to the District Court at the hearing on James's petition to appoint a conservator for Kloss. Engel's claim brings to mind the saying that "a boy cannot kill his own parents and then plead for mercy upon himself because he is a poor orphan boy." *Berry v. Jorris*, 199 S.W.2d 616, 619 (Ky. 1947).

## CONCLUSION

¶35 We fail to find persuasive any of the alleged mitigating factors cited by the Commission. The circumstances surrounding Engel's conduct leave us unable to follow the Commission's recommendation. Accordingly, it is hereby ordered that:

10

¶36    1. Joseph Engel, III, appear before the Supreme Court of the State of Montana on March 18, 2008, at 1:15 p.m. for the administration of a public censure;

¶37    2.    Joseph Engel, III, pay, or make arrangements to pay, the costs of the proceedings before the Commission.  Pursuant to Rule 9(A)(8), MRLDE, Disciplinary Counsel is directed to assemble and serve upon Joseph Engel, III, an itemized list of the costs and expenses incurred in this matter.  Joseph Engel, III, shall then have ten days thereafter to file written objections and, if he desires, to request a hearing before an Adjudicatory Panel;

¶38    3. Joseph Engel, III, shall be suspended as attorney and counselor for a period of sixty days, commencing as of the date of the public censure, at the expiration of which time, upon payment of all costs incurred in this proceeding, he may resume the practice of law without further order.

¶39    4. The Clerk of this Court is directed to mail copies of this Order to Joseph Engel, III, by certified mail, return receipt requested, and by ordinary mail to Joseph Engel's attorney, the Chairman and the Secretary of the Commission on Practice, the Office of Disciplinary Counsel, and the Executive Director of the State Bar of Montana.

DATED this 6th day of February, 2008.

/S/ KARLA M. GRAY
/S/ BRIAN MORRIS

/S/ JOHN WARNER
/S/ JIM RICE

Justice W. William Leaphart dissenting.

¶ 40    I dissent.  Given that the Commission on Practice has twice considered this matter and has had the benefit of hearing the witnesses firsthand, I would defer to the Commission's recommendation that Mr. Engel be subject to a public censure and be responsible for the costs of the disciplinary proceedings.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson and Justice Patricia Cotter join in the dissent of Justice Leaphart.

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER